# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>      Plaintiff, )<br>)<br>v. )<br>)<br>LADELL SMITH, )<br>      Defendant. ) | Case No. 13-cr-738<br><br>Judge Sharon Johnson Coleman |

## MEMORANDUM OPINION AND ORDER

Defendant Ladell Smith, a convicted felon, is charged with possession with intent to distribute 500 grams or more of cocaine and 100 grams or more of heroin in violation of 21 U.S.C. §841(a)(1), and possession of a firearm in violation of 18 U.S.C. §924(c)(1)(A) and §922(g). Smith now moves to suppress evidence seized from his Chevrolet Impala [29].[1] On September 8 and 9, 2014, this Court held an evidentiary hearing and, for the following reasons, the motion is now respectfully denied.

## BACKGROUND

On February 18, 2013, Cook County Municipal Judge Kathleen Ann Panozzo issued a search warrant authorizing law enforcement officers to search 317 E 25th St, 1st Floor West, Chicago, Illinois for a black semiautomatic pistol, ammunition, magazines and all other contraband. (Dkt. #17-1, Ex. A, Warrant.) The Chicago Police Department Sixth District Tactical Team executed the warrant on February 22, 2013, at approximately 9:41 a.m. Smith was found inside the apartment and read his *Miranda* warnings. Smith's fiancé, Wahneeta Preston, who was seven months pregnant at the time, as well as their two children were also in the apartment. Officers found cocaine, heroin, marijuana, a digital scale, a 9 mm live round of ammunition, more than $20,000 cash and a bullet-proof vest inside the apartment. (Dkt. #24-1, Ex A, Incident Report.)

A canine drug sniffing unit was dispatched to the scene and examined the exterior of two cars parked in or around the vicinity of the apartment building. The dog gave a positive alert for the presence of narcotics to a Chevrolet Impala registered to Smith and parked outside and down

---

[1] Smith filed his initial motion to suppress on January 7, 2014 [17] and the government filed a response brief [24]. On April 10, the Court granted Smith leave to file the instant amended motion to suppress on [27].

1

the street from Smith's apartment. The dog gave a negative result for the second car, a Nissan Maxima. The parties dispute whether the Maxima was parked in the garage or on the street, and no photographs of the Maxima were taken. Smith disputes that a canine drug sniffing unit was even present on the scene. Smith executed a written consent to search his Impala but alleges that he did so only after officers threatened to arrest his fiancé and take their children away.

Officers subsequently searched the Impala and found 1,138 grams of cocaine, 758.6 grams of heroin and a Glock, Model 27, .40 caliber semi-automatic pistol, bearing serial number LHK648. Smith was subsequently arrested. Smith now moves to suppress the items seized from his Impala arguing that the warrant did not include any vehicles within proximity of the apartment building, that Smith's written consent was not freely and voluntarily given and officers lacked probable cause to search the car. The Court held an evidentiary hearing on September 8 and 9, 2014.

## LEGAL STANDARD

The Fourth Amendment generally requires law enforcement to secure a warrant, particularly describing the place to be searched and the person or things to be seized, before conducting a search. U.S. Const. amend. IV; *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442 (1999). Indeed, a warrantless search is per se unreasonable under the Fourth Amendment subject to a few well-established exceptions. *Arizona v. Gant*, 556 U.S. 332 (2009). Where an individual's home or vehicle is searched without a warrant, the government must show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000).

## DISCUSSION

The parties do not dispute that the February 18 warrant was limited to Smith's apartment and did not extend to any vehicles registered to Smith or found near the vicinity of the premises to be searched. Smith challenges the warrantless search of his Impala on two grounds: 1) Smith's consent to search was not freely given, and 2) officers lacked probable cause to search the car.

*Evidentiary Hearing*

At the evidentiary hearing, Officer Eric White testified he learned from a confidential informant that Smith, a convicted felon, had a handgun inside his residence. White also testified that the informant stated Smith was a mid-level drug dealer and owned two cars – a blue

Chevrolet Impala that had a secret compartment used to stash drugs, and a blue or black Nissan Maxima, which was primarily driven by Ms. Preston.

White's partner, Officer Sean McDermott, testified that he and White drove with the informant to Smith's residence prior to executing the warrant, at which time the informant identified Smith's Impala. White testified that officers also ran the license plates of both cars and recalled the Impala was registered to Smith, and the Maxima was registered to Smith or Ms. Preston. On cross examination, White admitted that he did not write a report about having received information about Smith's Impala from the informant.

The morning the warrant was executed, White and McDermott each testified that they observed both cars parked outside the premises. Officers knocked and announced their authority, and forced entry into the apartment with a battering ram. White testified that Smith was in the living room and ran to the back bedroom. Ms. Preston (who was seven months pregnant at the time) and their two children were also in the bedroom. White testified that Smith was handcuffed in the bedroom and taken to the living room where he was read his Miranda warnings. White briefly questioned Smith while Ms. Preston and the children stayed in the bedroom.

Photographs show, and White testified to seeing, glass mixing cups, bags of drugs, a digital scale and packaging material in plain view in the kitchen, bathroom and bedroom. Photographs also show that two pit bulls were chained to the back door near the kitchen area.

After executing the warrant, White testified that he went outside to smoke a cigarette, explaining that he needed to calm his nerves before he conducted an exterior search. During this time, Ms. Preston had moved the pit bulls to the bathroom. White came inside and instructed officers to handcuff Ms. Preston because he intended to arrest her based on the drugs and paraphernalia he saw throughout the apartment and due to concerns about the safety of the children. No one called the Department of Children and Family Services ("DCFS"), but Animal Control was called early on to remove the pit bulls.[2]

White testified that Ms. Preston was calm and quiet, and was brought into the living room. White stated that he neither yelled at nor threatened Smith or Ms. Preston at any time. At

---

[2] Although not relevant to the Court's ultimate decision, it is important to note White testified that once the scene was secure, Animal Control was called to remove the two pit bulls from the premises. White also testified that it was his decision to not to call DCFS. White made this decision, in part, due to inconvenience of involving the agency. The Court notes that law enforcement officers are mandated reporters under the Abused and Neglected Child Reporting Act. 325 ILCS 5/4. The Court finds it very disturbing that DCSF was not called where, as here, toddlers were present and surrounded by a large amount of drugs in the home.

3

that time, White went to search the garage and testified that there was no car parked in the space "1W" assigned to Smith's unit. At some point, Ms. Preston's handcuffs were removed in order to help Animal Control corral the pit bulls, and she even chased one of the dogs that had gotten loose and ran down the alley. White did not recall if Ms. Preston was put in a police car in the alley, but once the dogs were handled she was brought inside and handcuffed again.

When officers had finished searching the apartment, White called a canine drug-sniffing unit to the scene. Jill Maderak, a Chicago Police Department dispatcher, testified that according to the event query for February 22, a canine unit was dispatched to the scene at 10:33 a.m. and cleared at 1:30 p.m., meaning that the unit was at that time available for another job. On cross, Maderak could not determine based on an entry in the event query whether the unit was en route to or from the scene at 12:52 p.m.

Officer Paul Wallace, of the canine unit, testified that he arrived at the scene with his canine partner, Redd, and White directed him to perform a sniff test for the Impala and Maxima parked on the street. Wallace testified that he commonly writes down the vehicle description and license plate in a small, personal notebook. Wallace's notes for February 22 suggest that he conducted a sniff test for the Impala, which was parked at approximately 306 E 25th Street at 11:15 a.m. and a sniff test for the Maxima parked at 316 E 25th Street at 11:22 a.m.

Wallace and White testified that the canine gave a positive alert to narcotics for the Impala and a negative alert for the Maxima. Wallace's written report contained several errors, including identifying the premises as 317 W 25th Street and references to a hostage situation. Wallace acknowledged his typos and explained he failed to remove erroneous information from prior reports or templates.

White testified that, after the positive alert, he went back inside to get the keys in order to search the car. At that time, Sargent Petrowski was allegedly talking to Smith about signing the consent to search form. White testified that neither he nor Petrowski yelled at Smith nor threatened Smith if he refused to sign the form. White did not remember mentioning DCFS to Smith or Ms. Preston at any time while during the search. According to White, Smith was calm and cooperative and his consent appeared to be entirely voluntary. Officers subsequently searched the Impala, including the hidden compartment in the dashboard, and recovered cocaine, heroin, and a firearm.

McDermott's testimony generally corroborated White's testimony that Ms. Preston was placed in and out of handcuffs, the canine alerted to narcotics in the Impala, Smith was calm and officers did not threaten him at any time during the search. McDermott testified that Petrowksi obtained Smith's written consent, but White's and McDermott's signature appear on the form. Officer Brenden Roberts testified he was present for most of Petrowski's discussion with Smith regarding the consent form. Roberts testified that Petrowski did not mention DCFS or threaten Smith at any time.

Petrowski did not testify at the hearing despite counsel for Smith's intention to call him. The government stated that Petrowksi was interviewed and prepared a report in June 2014 but had "virtually no recollection of the incident." The Court was informed that Petrowski allegedly suffered a head injury ten years ago that affects his memory in some fashion, but continues to serve as a sergeant for the Chicago Police Department. Defendant did not subpoena Petrowski.

Ms. Preston testified that, the night before the search, she parked the Maxima in the garage in their assigned space. Smith parked the Impala outside and down the street from the apartment. After officers forced entry into the apartment on the morning of February 22 and Smith was handcuffed, Ms. Preston estimated that she stayed in the bedroom with her children for about an hour. She testified that she moved the pit bulls from the kitchen area to the bathroom and later assisted Animal Control with removing the dogs. Ms. Preston stated that she was then placed without handcuffs in a police car in the alley for a few minutes.

When she came back inside the apartment, Ms. Preston testified that White was yelling at Smith telling him to sign the consent form, or he would arrest Ms. Preston and DCFS would take custody of their children. Ms. Preston testified that she cried and begged Smith to sign the form and, at some point, was handcuffed and taken to the squad car in the back alley again. She testified that White came out to talk with her and told her to convince Smith to sign the form. Ms. Preston stated she started screaming and crying and was brought back inside, still handcuffed, to try to convince Smith to sign the form. Smith asked to speak with Ms. Preston and, after their conversation, signed the papers. Ms. Preston stated that Smith was taken outside. When he came back in a few minutes later, Ms. Preston's handcuffs were removed and Smith was arrested.

Ms. Preston testified that she never saw any dogs performing a sniff test but acknowledged that she was never taken out the front door of her apartment. She testified that she is also a convicted felon and has been in a relationship with Smith for four years.

Finally, Smith testified that his car was parked on the street outside his apartment building, but down the street from his apartment on February 22. Smith stated he was in the bedroom with Ms. Preston and their two children when officers entered the apartment. Everyone was ordered to the floor, and Smith was immediately placed in handcuffs and taken to the living room. Smith testified that White spoke to him about signing the consent to search form and, after Smith's initial refusal, White became aggravated and yelled at Smith threatening to arrest Ms. Preston and call DCFS if Smith did not sign the form. Smith testified that he refused again. At that point, Smith stated that White directed an officer to place Ms. Preston in handcuffs and said he was calling DCFS. Smith testified that Ms. Preston was handcuffed and taken out the back of the apartment. She came back inside a few minutes later crying and begged for him to sign the form. After speaking with Ms. Preston, Smith signed the form.

*Smith's Written Consent to Search the Impala*

Smith does not dispute that he signed the consent form but argues he did so only after officers threatened to arrest Ms. Preston and have DCFS to custody of children. Consent to search is valid only if the consent was freely and voluntarily given. *United States v. Evans*, 27 F.3d 1219, 1230 (7th Cir. 1994). The question of whether consent was freely and voluntarily given, as opposed to the product of duress or coercion, is a question of fact to be determined from the totality of circumstances. *Id*. Based on the evidence and testimony presented at the evidentiary hearing, the Court finds that Smith's written consent to search his vehicle was not freely and voluntarily given and therefore cannot form a legal basis for officers' warrantless search of the Impala.

The Court heard conflicting testimony regarding Smith's agreement to sign the consent to search form. Smith and Ms. Preston testified that White presented the form to Smith and had extensive discussions with each of them, and handcuffed Ms. Preston, prior to Smith signing the form. Both testified that White threatened to arrest Ms. Preston and call DCFS if Smith did not sign the form. Both testified that Ms. Preston cried and begged Smith to sign the form. Ms. Preston testified that, after she was handcuffed and placed in a squad car, White told her to convince Smith to sign the form. Officers White, McDermott and Roberts all testified, generally,

6

that Petrowski presented the consent form to Smith and that did not threaten him in any way. Despite the government's reliance on this testimony and its control over Petrowski's availability, Petrowski did not testify at the hearing.

While Ms. Preston's bias is clear, the Court finds her testimony credible and her version of events more plausible than the officers' testimony. The court cannot in good conscience find Smith's consent was freely and voluntarily given in these circumstances.

*Automobile Exception to the Warrant Requirement*

Smith argues that officers lacked probable cause to search his Impala parked outside his apartment building. The government asserts that officers had probable cause to search the Impala based on the narcotics found in the apartment during the execution of the search warrant and the positive alert from the drug-sniffing canine. The government argues that the automobile exception to the warrant requirement applies here.

The Supreme Court first recognized the automobile exception in *Carroll v. United States*, 267 U.S. 132, 153-56 (1925). Under this exception, where there is probable cause to believe that a vehicle contains contraband or evidence of a crime, law enforcement may conduct a warrantless search of the vehicle. *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citing *Carroll*, 267 U.S. at 153–56). Whether probable cause exists involves "a practical, common-sense decision whether, given all the circumstances set forth ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Hines*, 449 F.3d 808, 814 (7th Cir. 2006) (quoting *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993)). The Supreme Court recognizes two justifications for the automobile exception: 1) a vehicle's "ready mobility" makes "immediate intrusion" necessary to prevent the destruction of evidence, and 2) the lesser expectation of privacy in a vehicle. *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004) (citing *California v. Carney*, 471 U.S. 386, 390-92 (1985).

The Court finds that officers had probable cause to search Smith's Impala and the search falls within the automobile exception to the warrant requirement. In making this finding the court considers several factors. As an initial matter, the February 18 search warrant authorized officers to search Smith's apartment for a black semiautomatic pistol, ammunition, magazines and all other contraband. Indeed, officers found a substantial amount of contraband inside the apartment – including cocaine, heroin, marijuana, a digital scale, a 9 mm live round of ammunition, more

than $20,000 cash and a bullet-proof vest. White and McDermott each testified that the informant told them Smith used his Impala to make drug deliveries to dealers throughout Chicago, and that the car had a hidden compartment for this purpose. McDermott testified that he and White drove with the informant and identified Smith's Impala prior to executing the warrant. Given this, officers reasonably believed there was a fair probability that contraband or evidence of a crime would be found in the Impala.

Smith's Impala was parked in front of his apartment building, but down the street from his apartment. As such, Smith had a minimal privacy interest in the vehicle. *Carney*, 471 U.S. at 391 (1985); *G. M. Leasing Corp. v. U.S.*, 429 U.S. 338, 339 (1977) (warrantless automobile seizures in public streets, parking lots, or other open areas, involve no invasion of privacy). Indeed, to examine the exterior of a car does not constitute a "search" because it is thrust into the public eye. *New York v. Class*, 475 U.S. 106, 114 (1986).

Furthermore, the canine positively alerted to the presence of narcotics within the Impala. The Seventh Circuit has held that a drug sniffing dog's positive alert provides probable cause to search a vehicle. *See e.g. United States v. Johnson*, 331 F. App'x 408, 410 (7th Cir. 2009) (dog's alert provided probable cause to search vehicle during traffic stop); *United States v. Loera*, 565 F.3d 406, 410 fn 3 (7th Cir. 2009) (noting that if officer "didn't have probable cause to believe he would find drugs initially, he definitely did when [drug sniffing] dog alerted to their presence"); *see also Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (walking a drug-sniffing dog outside the exterior of a vehicle is not a search). Smith's attempts to challenge whether the sniff test occurred are unavailing. While Wallace's report has several errors, most are typographical and do not seriously call into question whether the sniff test actually occurred. Additionally, Smith and Ms. Preston each testified that the Impala was not visible from the apartment and neither were taken to the front of the apartment during the time in question.

While the better practice clearly would have been for officers to simply obtain a warrant to search the vehicle, the Court finds that the search of the Impala falls within the automobile exception to the warrant requirement. *See U.S. v. Hibbs*, 905 F. Supp. 2d 862, 868-869 (C.D. Ill. 2012) (probable cause existed to search truck parked on public street outside home, drug-sniffing dog alerted to truck for narcotics, officers had valid warrant to search home and found narcotics within home); *see also U.S. v. Smith*, 510 F.3d 641, 647-650 (6th Cir. 2007) (affirming district court's finding that automobile exception applied where officers found narcotics, $17,000 in

cash, jewelry and firearms in warrant-supported search of defendant's home and officers were aware of defendant's use of vehicles in drug-trafficking activities); *U.S. v. Dumas*, 313 F.3d 372, 377-378, 380-381 (6th Cir. 2002) (affirming district court's finding that automobile exception applied was bolstered where officers had warrant to search defendant's home, found narcotics and more than $5,000 in the home and defendant had been seen using vehicle while engaging in criminal activity, but noting search of vehicle yielded only a digital scale and one document).

The Court emphasizes its finding that Smith's consent was not freely and voluntarily given. However, given the totality of the circumstances, officers had probable cause to suspect that "contraband or evidence of a crime" would be found within the Impala and the search was authorized under the automobile exception.

**Conclusion**

For the foregoing reasons, Smith's motion to suppress is denied.

IT IS SO ORDERED.

_____
Date: September 26, 2014

United States District Judge